**In re CONTINENTAL MORTGAGE INVESTORS, Debtor.**

No. 76–593–S.

United States District Court,
D. Massachusetts.

Nov. 20, 1979.

See also, Bkrtcy., 5 B.R. 773.

Alan Lefkowitz, Gaston Snow & Ely Bartlett, Boston, Mass., for debtor.

Robert F. White, Sherburne, Powers & Needham, Boston, Mass., for Debentureholders Committee "A".

Guy Moss, Widett, Slater & Goldman, Boston, Mass., for Debentureholders Committee "B".

Robert M. Gargill, Choate, Hall & Stewart, Boston, Mass., for Senior Creditors' Committee.

Nathan Fuchs, New York City, for Securities Exchange Com'n.

Daniel M. Glosband, Goldstein & Manello, Boston, Mass., for Trustee.

ORDER ON APPLICATION OF SEC FOR STAY AND INJUNCTION OF SOLICITATION OF CREDITORS AND STOCKHOLDERS

SKINNER, District Judge.

The Securities and Exchange Commission (SEC) has applied for an order staying and enjoining a proposed notice and solicitation of various classes of security holders for affirmative votes approving a tentative proposal for the final settlement of this case. Whether this proposal is a two-stage "compromise" of some claims followed by a "simple composition" of others, as proponents of the plan describe it, or is in reality a unitary major reorganization is a question of considerable importance, since one of the elements of the proposal is a retransfer of this case to Chapter XI as a final step to consummating a consensual plan. *In re Continental Inv. Corp.*, 586 F.2d 241 (1st Cir. 1978); *SEC v. American Trailer Rentals*, 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965). Since we are dealing with what I perceive as an unsettled posture of some of the parties, with a considerable potential for the further realignment of parties and issues, it is premature to make a final judgment on this question at this time.[1] It is sufficient to deal with the issues raised by the SEC's application.

The proposed plan calls for the creation of a "core company," which will be owned by the holders of junior debt and the stockholders, with the junior debt having 70% of the control. The "core company" would be left with two properties in Hawaii, six million dollars in cash, and the benefits and burdens of assorted non-asset litigantion. All the remaining assets of the debtor would be transferred to a liquidating trus-

---

1. My statement at the hearing on November 16 that I would not consider this matter as a "simple composition" was based on my imperfect understanding of the two-stage process which the debtor contemplates.

tee, who would in due course liquidate these assets for the benefit of the senior debtholders. Various escrow arrangements would be made to provide funds for the defense and settlement of adverse non-asset litigation, and the apportionment of recovery in productive non-asset litigation. Litigation concerning particular assets in general follows the assets to which it refers.

This proposal is not only for the purpose of resolving actual claims, but also as a compromise of the senior debtholders' appeal of the May 1, 1979 order of this court transferring the case to Chapter X, and of a potential claim by junior debtholders that some of the senior debt is subject to "equitable subordination" because of too active participation by senior debtholders in the management of the debtor.

There are several dilemmas surrounding this proposal. The first is that there are several critical participants who either have not agreed or who actively oppose the proposed settlement, and even those parties who have executed the Memorandum of Agreement have conditioned their continued participation upon various contingencies.

The second is the tension between the necessity, in any view of this case, to provide at least the substance of the protection offered by Chapter X to public investors and the very real possibility that strict adherence to the rigors of Chapter X and its absolute priority rule will result in treatment for those investors substantially less favorable than the resolution provided by the proposed settlement. In short, at least according to present estimated valuation of the debtors' assets, the senior creditors might well end up with all the assets if strict priorities are observed.

The third dilemma is related to time. Time is not just a factor of convenience, efficiency and reduction of cost, but a tradable asset of measurable value. At present interest rates, it is worth it to the senior creditors to accept a discount on the face value of their claims if their money can be

recovered and put back to work. Accordingly, if too much time is lost in securing the formal protection of Chapter X, the potential financial advantage to the public security holders may be lost.

The fourth dilemma is related to the first. Without a substantial consensus, the orders necessary to carry out the settlement may well be appealed,[2] particularly by the SEC, whose mandate to protect the public is properly only minimally constrained by cost/benefit considerations. Any time advantage would thereby be destroyed.

Additionally, Debentureholders' Committee B is opposed to the settlement, because of a suspicion, shared by the SEC that the assets to be assigned to the senior creditors have an "off-book" value greater than that currently assigned to them for purposes of settlement. Both these groups are awaiting the report of the Chapter X trustee.

Furthermore, the agreement requires all of the holders of senior debt to participate. Senior creditors represented by Attorney Morse have not signed the memorandum and have represented that they may not do so unless satisfied on the basis of the Chapter X Trustees' report that the values are acceptable to them. Even the signatory senior creditors have left themselves the option to withdraw if the Chapter X Trustees' report shows values at odds with their present understanding.

A sufficient consensus to bring about a viable settlement of this case as projected by the debtor and the Senior Creditors' Committee may never come about. It is apparent from the posture of the parties at the argument on November 16, however, that it might come about if the various opposed or neutral parties are satisfied (a) that the Chapter X Trustees' report contains a reliable valuation of the real estate, litigation and potential inter-class claims, (b) that the Trustees are satisfied that the proposed settlement is fair, and (c) that the reported valuations support the Trustees' conclusion and satisfy the parties that their

---

**2.** I doubt very much that the Court of Appeals has indicated any view of the proposed settlement by staying the current appeal and remanding this case.

respective interests are properly protected. It is equally apparent that there will be no such consensus, and *indeed no substance to the Memorandum of Agreement*, unless the critical participants described above are satisfied as to factors (a), (b) and (c).

By the same token, the recipients of the proposed notice should be in a position to make the same informed judgment before committing themselves to approval of the proposed settlement.

The foregoing analysis (if correct) demonstrates to my satisfaction that the Memorandum of Agreement does not as yet have a sufficient underpinning of consensus and unconditional approval even from its proponents to warrant a general notice to all creditors and stockholders seeking their approval. The proponents express an optimism bordering on the manic that all of these problems will go away. They may indeed, but that depends on the content of the Chapter X Trustees' report more than any other single fact. I see no point in permitting the notice and solicitation until all parties have the report of the Chapter X Trustees and that report can be included in the notice and solicitation. As I understand the Trustees' present schedule, this will bring about a delay of approximately a month in the scheduling of a hearing.

Accordingly, the motion of the SEC is ALLOWED to the extent that distribution of a notice of a hearing on motions to approve the compromise and transfer the case to Chapter XI and of a solicitation of acceptances of the compromise is STAYED until such time as the report of the Chapter X Trustees has been filed and can be copied and included in any distribution to creditors and stockholders. Before such a distribution is made, the court should have some assurance that the proposed plan of settlement is acceptable to the senior creditors, or at least not opposed by any of them.

If the parties to the Memorandum of Agreement feel they cannot continue settlement efforts under the foregoing constraints, they are directed to inform the court immediately. I shall then direct the Chapter X Trustees to proceed with the preparation of a plan in accordance with Chapter X.

See also, Bkrtcy., 5 B.R. 771.